The lower Court in a well written opinion has carefully analyzed the testimony in this case and correctly determined the issues involved, which are purely factual. Its opinion is as follows:
"Plaintiffs, Henry Goodstein, Frank O. Blair and Daniel D. Kervin, filed suit against defendants, Mrs. Alice K. Millikin and Dr. Marie Millikin, claiming ownership of 20 head of cattle, alleged to have been impounded in the cattle pastures of defendants, and praying for judgment against defendants condemning them to return, deliver and restore said cattle so claimed by plaintiffs, or if and in the event defendants were unable to restore said cattle to plaintiffs' possession, then alternatively, that defendants be required to pay for the fair value of said 20 head of cattle, which is alleged to be the sum of $1000.00, with legal interest thereon from September 29, 1941 until paid. Plaintiffs further prayed for a writ of sequestration of the cattle in controversy. The cattle were accordingly sequestered but defendants executed a bond for release of this writ thereby retaining physical possession of the animals. While the plaintiffs claim that defendants held possession of 20 head of cattle, only 19 were seized under the writ of sequestration. There was no evidence to show what became of the twentieth head, consequently the Court has only to consider and determine the ownership of 19 head of cattle.
"The suit was filed against Dr. Marie Millikin and her mother, Mrs. Alice K. Millikin, but Dr. Millikin testified that her mother had no interest whatsoever in the said cattle; that she owned the cattle business individually. Plaintiffs offered no testimony to prove contrary ownership of the cattle in controversy. It can therefore be assumed by the Court that plaintiffs abandoned any claim against Mrs. Alice K. Millikin. *Page 95 
"This suit was filed on September 29, 1941 and on the same date a registration of brand was filed and recorded in the office of the Clerk of Court of East Carroll Parish by plaintiffs, said brand being designated and described as follows:
"`Be it known and remembered, that on this the 27th day of September in the year 1941, before me, the undersigned authority, duly commissioned and qualified in and for the above named Parish and State, and in the presence of the undersigned competent and attesting witnesses, personally came and appeared Henry Goodstein, Frank O. Blair and Daniel D. Kervin, each and all being legal residents of and domiciled in the Parish of East Carroll, State of Louisiana, and said appearers jointly and severally declared that they have and do hereby adopt the following mark and brand for their livestock, to-wit:
"`The brand is composed of two parallel bars, two and three-fourths inches long, each of said bars being one-fourth inch in width, spaced two inches apart, said bars being two and one-half inches in width from outside bar to outside bar; said brand being placed by said owners on the left hip of the livestock. If the brand is placed heavily on the livestock sometimes a connecting bar will show or appear, thus making the brand appear like the letter "H" of the above size and dimensions. The mark is NONE.
"`The said appearers further declared that in accordance with the law they do hereby notify and warn all other persons or firms against adopting or using the said above described brand and/or mark.'
"Considerable evidence was adduced concerning this brand, and it was shown by competent testimony that the 19 head of cattle were all marked with the brand described in registration and claimed as the mark of plaintiffs, although there was controversy and disagreement as to whether or not some of the cattle in question were actually branded as claimed, due to imperfect use of the branding iron and the growth of hair and skin over the brand itself.
"In order to secure first-hand information, this Court, accompanied by Mr. W.B. Ragland, Lake Providence, Louisiana, a competent and experienced cattleman, repaired to the lot on the Millikin Place where said cattle were penned, and made a personal inspection of the brand on the livestock claimed by plaintiffs. In each instance the hair over the brand was saturated with water in order to permit the actual observance of the branding, and in each instance parallel bars, or the mark sometimes described as `eleven' was plainly visible, although in one or two instances there appeared to be an `H' instead of the `eleven' due, as explained by Mr. Ragland, to the impression made by the cross or connecting bar of the branding iron. The brand of plaintiffs has been described as parallel bars or the `eleven' mark, while the defendants' brand has been described as the `Diamond M' or as an `M' with a diamond around it or four bars made in the shape of a diamond.
"There is practically no question of law to be determined in this case. The issues revolve around the sole factual question of the ownership of the livestock.
"The lands on which the respective herds of cattle, belonging to plaintiffs and defendants, are pastured are contiguous; the fences separating the pastures are in poor condition, making it easy for the livestock to break through and to mingle. The testimony concerning the technique of cattle-branding revealed that it is a rather difficult procedure. It is very easy to enlarge, distort, make the impression too heavy or too light and many other factors that tend to change the appearance of the brand. As a consequence of this condition, the brands change in appearance, grow longer, wider, lighter and sometimes apparently disappear altogether. There are quoted hereinbelow from the transcript of testimony several questions propounded to Mr. W.B. Ragland and answers thereto, as follows:
"`Q. Now, Mr. Ragland, from your experience with livestock and the branding of livestock, give us the benefit of your knowledge with reference as to whether or not it is an easy matter to make branding uniform on all cattle? A. Well, it is mighty near impossible to make it uniform and a brand made with the same iron will vary over a period of time, and lots of times it depends on the way you handle the iron, how you press it, if your animal is rearing or pitching any, it is liable to be two or three inches longer or probably wider than your iron would be, because when you stick that iron to them he tries to get away; it will vary quite a bit.
"`Q. Does the manner in which the iron is heated have any effect? A. Yes, sir, and the pressure you put on it too. *Page 96 
"`Q. Then, would you say that an iron with parallel bars with equal length that it is very probable that the length of the brand as it appears on an animal's hide, the length of the bars will vary? A. Yes, sir, if you press it more on one side or on the end it will brand deeper; if you press the top of it the hardest, the bottom will not show up as well, or to the side, one bar might not show up.'
"This condition has therefore created considerable confusion in the testimony of the witnesses as to the actual marking and specific identification of the plaintiffs' brand on the cattle in question. However, an analysis of this particular testimony, coupled with the personal inspection made by the Court, has convinced the Court that the mark or brand on said nineteen head of livestock was the same as the registered brand of plaintiffs, allowing for the variations in branding as described by Mr. Ragland.
"The parties litigant had some difficulty in establishing the source of original purchase of the respective cattle; it was also determined that most of the cattle purchased by the several parties had been branded with other marks and brands, and in several instances it appeared that one brand had been superimposed on another.
"Mr. Kervin, one of the plaintiffs, who was a part owner of and in actual and continuous charge of the cattle of plaintiffs' partnership, testified that all cattle purchased by them were branded with the `eleven' brand as soon as they were delivered; that he was thoroughly familiar with the cattle in question; that he made repeated efforts to effect their release from defendants without avail, and then he positively identified said cattle as belonging to and being the property of plaintiffs. That all of them bore the brand of the partnership.
"Mr. Blair, another one of the plaintiffs herein, testified as to the repeated efforts made by him and Mr. Kervin to secure the cattle, but without success, as Dr. Millikin always made excuses for non-delivery but promised to have more definite identification made.
"The testimony of plaintiffs' witnesses was direct and positive as to ownership and identity and the facts as related by each of them coincided on pertinent points.
"The testimony of John L. Loyd, taken by deposition, appeared to this Court to be confused, somewhat contradictory and disconnected. It did reveal that the system of branding used by defendants was, to say the least, very informal; that no regular procedure was used. The witness criticized the technique so adopted in branding defendants' cattle. This testimony of Mr. Loyd has very little probative value. The testimony of Robert Thomas, colored, revealed a lack of definite knowledge of the cattle that he was supposed to superintend for defendants. While he positively identified the cattle in question as being the property of the defendants, his other testimony was rambling and disconnected and did not bear out the facts as adduced from other witnesses. This witness was an ignorant negro, a former fugitive from justice and an ex-convict, convicted of manslaughter.
"E.M. Buckley, former assistant-manager for the defendants, testified that the branding for defendants was poorly done, as is evidenced by the following testimony:
"`Q. Will you describe the method of branding the Millikin herd that was in use and in force at the time you were there as to how the brands were applied, the method? A. She used a Diamond M for branding her cattle and she would just run them in the chute and apply the iron to them is all.
"`Q. Was it a deep brand you applied or rather a hair brand? A. No, sir, maybe we would get a good brand on one of them and then four or five of them — using the brand with one heating, brand several of the cattle we had in the chute, the darkies were doing the branding and they didn't do good jobs of it.
"`Q. They were branded while standing in the chute — were they roped and thrown and branded? A. No, sir.'
"While his testimony as to the appearance of the brand was intended to prove that the cattle in question did not bear the `eleven' mark of the plaintiffs, it in reality corroborates the testimony of Mr. W.B. Ragland and as to the variations in the brand.
"In addition, it was shown that his supervision of the Millikin cattle was poor. He left it to the negro employees. He admitted neglect of duty, as revealed by the following testimony.
"`Q. Is it not also true that in branding cattle, you experienced considerable difficulty in getting uniform brands? A. From what little I know about cattle, they should be thrown down and held to brand them; now this way we went through *Page 97 
branding ours, we made a mess of it; every time when we stuck the hot iron to them they would jump out of the way of it and we never would get it like it should be.
"`Q. Out of the 18 or 19 head of cattle branded at least two times per animal, from your experience in handling livestock, would you not deem it strange that there is absolutely no evidence of the Millikin brand on any animal? A. If I had had hold of the iron myself, I would have tried to make a better job, but we made a mess of branding those cattle, never did do a good job of branding them; those darkies would dab the iron to them and act like they were half scared to burn them; we didn't make a good job of it.'
"His lack of knowledge of affairs of his employer and his neglect of his duties are admitted by him in the following testimony:
"`Q. Do you plead guilty to also neglecting everything else in the same manner you neglected your branding duties? A. Yes, sir, I do; I couldn't get round to all of it.
"`Q. You then made a mess of your whole work up there? A. Yes, sir, that's right, never could get to all that needed to be done.'
"In addition to this, a portion of his testimony relating to a purported conversation had with Mr. Kervin and Mr. Blair concerning the return of cattle, was contradicted affirmatively by both of these gentlemen on rebuttal. The credibility of this witness was considerably impaired and his testimony was of little or no value.
"The only testimony adduced by defendants that this Court has given any weight to is that of Dr. Millikin. The Doctor testified as to what she knew of her own knowledge of the event surrounding this controversy. However, when Dr. Millikin was asked a direct question, — `Are they your cattle?,' She replied, — `I feel they are my cattle.' Again when she was asked the question, — `Have you been positive, Doctor, all that period of time that the cows were yours?' She replied, — `I felt they were all mine'.
"`Q. Have you ever weakened during that period of time to the extent that you felt you would have to have the concurring evidence of one of your managers in order to sustain your position? A. Yes, I said that if Mr. Buckley, who had been more closely thrown with the cattle, said any one in the herd was not mine, I would release the cattle to them.'
"There was considerable testimony relative to the branding of eleven head of cattle purchased by defendant from a Mr. Thatch with the `eleven' brand. Dr. Millikin testified that these particular cattle were soon after delivery branded with the Diamond M, but it was admitted that none of the cattle under seizure bore the Diamond M brand.
"Dr. Millikin owned varying numbers of cattle from time to time from as low as 15 or 20 up to 265 head. She is an extremely busy person, attending to her very large plantations and various interests. It was a physical impossibility for her to give the close care and attention necessary in order to positively identify any given group of cattle. She had to rely on employees who were not only inefficient but who to a certain extent practiced deception that resulted in disadvantage to her. There is no question as to her sincerity in claiming ownership to these cattle, but the evidence in this case points inevitably, in the opinion of this Court, to the conclusion that the cattle claimed by plaintiffs are in fact their property. It is not inconceivable that some of the livestock not owned by plaintiffs may have been branded with marks similar to their brand, but the weight and preponderance of the evidence favors the plaintiffs' contention.
"It is ordered, adjudged and decreed that plaintiffs' ownership of said livestock be recognized and accordingly there be judgment in favor of plaintiffs and against defendant, Dr. Marie Millikin, condemning defendant to return and restore unto petitioners the livestock, and any increase therefrom, consisting of the nineteen head of cattle originally sequestered by the plaintiffs and described in the pleadings and testimony herein as follows:
"1 Jersey steer, about 3 years old
"1 Red muley heifer
"1 Black cow
"1 Spotted calf
"1 Jersey heifer, about 3 years old
"1 Brindle steer
"1 Red nubbed horn heifer
"1 Mottled face heifer, about 3 years old
"1 Red cow
"1 Red cow
"1 Black muley heifer, about 2 years old
"1 Spotted heifer, about 3 years old
"1 Brown heifer
"1 Dark Jersey steer
"1 Spotted dehorned cow
"1 Brown heifer, about 3 years old *Page 98 
"1 Muley brown, white-faced heifer
"1 Spotted cow
"1 Dark red steer, about 2 years old
or, in the alternative, if defendant is unable to restore and return said property, then said defendant be and she is condemned to pay to petitioners the sum of eight cents per pound, with interest thereon at the rate of 5% per annum from September 29, 1941 until paid for livestock not restored, said price to be computed on the weight of each head of livestock described in plaintiffs' petition.
"It is further ordered, adjudged and decreed that defendant be condemned to pay all costs of this suit."
A careful study of the record convinces us of the correctness of the opinion of the lower Court and we could only repeat what is said therein.
We therefore adopt the opinion of the lower court as our opinion, and the judgment of the lower Court is therefore affirmed, with costs.